NOT DESIGNATED FOR PUBLICATION

No. 123,100

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RONALD LEVON BUCHANAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Opinion filed August 26, 2022. Affirmed.

*Jennifer C. Bates*, of Kansas Appellate Defender Office, for appellant, and *Ronald Buchanan*, appellant pro se.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., COBLE, J., and PATRICK D. MCANANY, S.J.

PER CURIAM: A jury convicted Ronald Levon Buchanan of multiple charges including three counts of attempted first-degree murder and six counts of aggravated arson after an early-morning fire in the apartment complex where his daughter lived. Buchanan appeals his convictions. He contends the aggravated arson convictions were multiplicitous, the State presented insufficient evidence to show he intended to kill three victims, and the district court violated his right to conflict-free counsel. And in a

1

supplemental pro se brief, Buchanan makes additional claims challenging the evidence and alleging prosecutorial error.

Although the ignition of the fire was a single act, we find Buchanan's aggravated arson convictions do not improperly charge him with multiple offenses for that sole action because the applicable statute permits prosecution for each occupied apartment within the complex. The State presented sufficient evidence to support the attempted first-degree murder convictions. The district court did not violate Buchanan's right to conflict-free counsel where his pro se motions for new trial were untimely and did not abuse its discretion in summarily denying relief. Buchanan's remaining supplemental issues are unpersuasive because they are either not preserved for appeal or are unsupported by the record. We affirm his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

On May 13, 2018, Buchanan's daughter, Maraya Buchanan, graduated from high school. Maraya and her father previously had an argument that led to her uninviting Buchanan to the graduation ceremony, although he attended against her wishes. Maraya did not speak to her father at the ceremony. After the contentious event, Buchanan posted to his social media account about his discontent with the graduation, his hurt feelings, and the disrespect he felt from his daughter and her mother, Dena Rendon.

Maraya, her mother, and Maraya's younger brother, K.J., lived together in an upper-floor unit of the Springhill Apartments complex in Overland Park, Kansas. After the graduation ceremony, Maraya returned to the apartment with her mother and brother. Later that night, Buchanan texted Maraya requesting she leave the key to his own apartment outside of her apartment so he could retrieve it. Maraya placed the key under the doormat outside her front door at the top of the apartment stairs. Mother moved her car to give Buchanan the appearance she was not at home to avoid any confrontation.

2

After seeing Buchanan's social media post on Facebook about Maraya's graduation, Theresa Griswold, one of Maraya's neighbors in the apartment complex, contacted him. Buchanan told Griswold that he was upset about how he had been treated and asked Griswold to retrieve some of his property from Maraya's apartment. She initially agreed, but when she could not reach Maraya's mother, and because it was so late (around midnight), Griswold feel asleep. Griswold woke a few hours later to find her apartment was on fire.

Around the same time, K.J. opened the front door to their apartment and saw a "doorway full of fire" that would not permit the family access to the stairs to escape the fire. Having no other options, the family tied blankets together and Mother lowered her children out the window to the ground before climbing out herself.

Just after 4 a.m. on May 14, 2018, the Overland Park Fire Department responded to the fire at the apartment complex. The severity of the fire, combined with the apartment complex's numerous occupants, required the help of 10 fire companies and multiple ancillary units. Multiple occupants were trapped inside the building when the fire companies arrived, but rescue was difficult because the fire caused some of the external walls to collapse. All occupants managed to evacuate, except for a dog belonging to Maraya and her family.

Once the fire was extinguished, fire investigators combed through the remains and determined the origin of the fire was the exterior doorway to Maraya's apartment. The lead fire investigator testified the southeast exterior stairway landing—the doorway to Maraya's apartment—was the origin of the fire based on the fire patterns and because the landing was "totally burned out and consumed by the fire."

Investigators determined the fire was intentionally set after ruling out other possible sources. The investigators considered and eliminated electrical sources, natural

3

causes, and equipment malfunction. Similarly, the investigators concluded a cigarette, or other carelessly discarding smoking materials, could not have caused the fire because the stairwell was "very well kept and clean" with no material to fuel such a fire.

While scanning for evidence, a canine trained in detecting accelerants alerted to a glass lemonade bottle lying in a grassy area next to the apartment building. The bottle contained a small amount of a clear liquid. After taking the bottle and its contents into evidence, a forensic scientist at the Kansas Bureau of Investigation (KBI) later confirmed the liquid was acetone.

Maraya told fire investigators at the scene that she believed her father, Buchanan, started the fire. Mother reiterated this claim. After escaping the apartment, Maraya texted Buchanan and conveyed she believed he was responsible. Buchanan responded saying he had "no clue" what she was talking about and that he had "been sitting here getting [his] thoughts together on how [he] was treated at the graduation." A couple of hours later, Buchanan messaged Maraya's friend, Kourtney Snype: "Maraya treated me like shit at her graduation refuse to take a pic with me and gave the 50 dollars in [r]oses away when I gave them to her, then I wake up <u>this</u> <u>morning</u> and [mother]'s house on [sic] fire and my dog is dead." Buchanan then denied responsibility for the fire and shared he did not care what losses Maraya and her mother had suffered as a result of the fire. Buchanan also posted to social media a picture of the fire alongside this statement:

> "Wow Pray for Daughter and her mom, but Hot Damn Karma moves with the speed of lighting [sic], their house burned down last night. Lost everything they have my compassion but they have no support from me. I have 2extra rooms and I'll rather use them [sic] rooms as piss pads before they're welcome [ . . .] they Got What God sent to em. Damn I wish they [sic] house didn't burn down but I'll be a lie [sic] if I said I cared . . . ."

4

About one month later, police detectives interviewed Buchanan. He spoke with the detectives about his argument with Maraya and the alleged events at the graduation ceremony that caused him to become upset and feel disrespected. Buchanan told the detectives he became ill after the graduation, and he took himself to the hospital emergency room at Research Medical Center in Kansas City. Buchanan stated he went to the hospital at about 11:30 p.m. on May 13, but left a couple of hours later, around 2 a.m. But when detectives contacted the hospital, the hospital did not have a record of Buchanan being at the hospital on May 13 or 14, however, their records did show Buchanan receiving care on May 24, 2018.

The detectives collected DNA samples from Buchanan, which were evaluated against the DNA gathered from the glass lemonade bottle found at the apartment complex. A detective later testified the DNA samples analyzed from the lemonade bottle and Buchanan, in layman's terms, provided "strong support for Ronald Buchanan being the source of that DNA" found on the bottle. The lab report analyzing the DNA swabs showed:  "Assuming a single male source, it is 394 million times more likely to see this partial DNA profile **if** Ronald Buchanan is the source **than if** an unknown individual is the source."

Detectives also testified they determined Buchanan's cell phone movements using his cell phone records. The detectives determined Buchanan's cell phone traveled from Missouri into Johnson County, Kansas, near the apartment complex, at about 3:33 a.m. on May 14, 2018, the morning of the fire. Buchanan's cell phone crossed back into Missouri at approximate 3:55 a.m. the same morning. Detectives were also able to use traffic cameras and located a car matching the description of Buchanan's traveling near the apartment complex at that time frame, and leaving 10 minutes later.

In July 2018, the State charged Buchanan with 10 counts of aggravated arson and one count of cruelty to animals. The State later amended the complaint to include

alternative counts of attempted first-degree murder of Maraya, her mother, and K.J. The case proceeded to a three-day trial in January 2020. Buchanan testified and denied starting the fire. Throughout his testimony, Buchanan explained the State's evidence against him. For example, Buchanan did not dispute his DNA was on the lemonade bottle, but claimed he used the bottle and the acetone within it to remove excess paint off a bicycle he was working on at the apartment complex.

Ultimately, the jury convicted Buchanan of three counts of attempted first-degree murder, six counts of aggravated arson, and one count of cruelty to animals. Two days before sentencing, Buchanan filed a pro se motion for new trial alleging, among other things, ineffective assistance of counsel. Buchanan's defense counsel filed a motion for new trial the next day that did not contain any argument but stated the motion was filed "pursuant to K.S.A. 22-3501 . . . ."

The district court addressed both motions at the sentencing hearing. Relevant to this appeal, the district court refused to consider Buchanan's pro se motion because Buchanan was represented by counsel and Buchanan did not have a right to "hybrid representation." The district court did, however, consider the motion filed by counsel. Even so, the district court denied the motion because it did not provide a reason to grant a new trial.

The district court sentenced Buchanan to 272 months' imprisonment on the first attempted murder count, and 155 months' imprisonment for each of the two remaining attempted murder counts—each to run concurrent to the first count. The district court sentenced Buchanan to 59 months' imprisonment for each of the 6 aggravated arson counts and 1 year imprisonment on the cruelty to animals conviction. In total, the district court sentenced Buchanan to a controlling sentence of 331 months' imprisonment.

Buchanan appeals.

6

## BUCHANAN'S CONVICTIONS WERE NOT MULTIPLICITOUS

In this appeal, Buchanan first contends his six aggravated arson convictions are multiplicitous because they were based on singular conduct—the setting of a single fire. Multiplicity is the charging of a single offense in several counts. *State v. Weber*, 297 Kan. 805, 808, 304 P.3d 1262, 1266 (2013). A multiplicitous conviction violates the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights because it establishes multiple punishments for a single crime and thus violates a defendant's fundamental right to a fair trial. *Weber*, 297 Kan. at 808; *State v. Gomez,* 36 Kan. App. 2d 664, 668, 143 P.3d 92 (2006).

Although Buchanan admits he did not raise this issue before the district court, our Kansas Supreme Court has considered multiplicity challenges for the first time on appeal to serve the ends of justice or prevent a denial of fundamental rights. *Weber*, 297 Kan. at 809; *State v. Colston*, 290 Kan. 952, 971, 235 P.3d 1234 (2010), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Other panels of this court have likewise addressed a multiplicity claim under the same exception. See *State v. Moore*, No. 116,275, 2017 WL 5016039, at *8 (Kan. App. 2017) (unpublished opinion); *State v. Brooks*, No. 113,636, 2017 WL 839793, at *5 (Kan. App. 2017) (unpublished opinion). Despite the State's assertion to the contrary, it has not presented an argument that overcomes addressing the issue under this exception. The State simply states the record could benefit from more facts without providing an argument on why the new facts are necessary for the analysis. We find additional facts are unnecessary and reach the issue as our Supreme Court did in *Weber* and *Colston*.

Appellate courts exercise unlimited review over questions of law involving multiplicity and statutory interpretation. *State v. Harris*, 284 Kan. 560, Syl. ¶ 3, 162 P.3d 28 (2007); *State v. Fisher*, 283 Kan. 272, 312, 154 P.3d 455 (2007); *State v. Bryan*, 281 Kan. 157, 159, 130 P.3d 85 (2006).

The Kansas Supreme Court has outlined the analytical framework for determining whether multiple convictions subject a defendant to double jeopardy by imposing cumulative punishments in one case. "[T]he overarching inquiry is whether the convictions are for the same offense." *State v. Schoonover*, 281 Kan. 453, 496, 133 P.3d 48 (2006). This review is broken into two components, both of which must be met to find a double jeopardy violation. First, the court must ask whether the convictions arise from the same—or unitary—conduct. If not, there is no multiplicity concern. But if there is unitary conduct, the court then examines whether the conduct, by statutory definition, constitutes one offense or two. *Weber*, 297 Kan. at 809; *Schoonover*, 281 Kan. at 496.

To first determine whether the convictions arise from the same conduct, the *Schoonover* court provided some factors to consider:

> "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." 281 Kan. at 497.

The State concedes, and Buchanan similarly argues, that his aggravated arson convictions arise from the unitary conduct involving the ignition of a single fire in the stairwell of the apartment complex. This conclusion is supported by the record, which shows the lead fire investigator testified that the fire originated on the complex's southeast exterior stairway landing leading directly to Maraya's apartment unit, and the fire was intentionally set in that location. Having met the first component of the analysis, we must determine whether the statutory provision provides for two offenses or only one. 281 Kan. at 496.

When a double jeopardy issue arises from convictions for multiple violations of a single statute, as happened here, appellate courts apply the "'unit of prosecution'" test. 281

8

Kan. at 497. In a unit of prosecution case, the court asks how the Legislature has defined the scope of conduct composing one violation of a statute. Under this test, the statutory definition of the crime determines what the Legislature intended as the allowable unit of prosecution. There can be only one conviction for each unit of prosecution. 281 Kan. at 497-98. "The determination of the appropriate unit of prosecution is not necessarily dependent upon whether there is a single physical action or a single victim. Rather, the key is the nature of the conduct proscribed." 281 Kan. at 472.

*Interpretation of K.S.A. 2017 Supp. 21-5812*

A jury convicted Buchanan under K.S.A. 2017 Supp. 21-5812(b)(1), which defines aggravated arson as "arson, as defined in subsection (a): (1) Committed upon a building or property in which there is a human being." Arson, under K.S.A. 2017 Supp. 21-5812(a)(1)(A), is defined as: "Knowingly, by means of fire or explosive damaging any building or property which: (A) Is a dwelling in which another person has any interest without the consent of such person."

The statute for arson and aggravated arson is contained within Article 58, "Crimes Involving Property," of the Kansas Criminal Code. See K.S.A. 2017 Supp. 21-5812. Although Article 58 does not define the terms used in the arson statute, the Legislature did provide definitions in the Kansas Criminal Code which "shall apply when the words and phrases defined are used in this code . . . ." K.S.A. 2017 Supp. 21-5111. An appellate court must consider various provisions of an act *in pari materia* with a view of reconciling and bringing the provisions into workable harmony if possible. See *State v. Keel*, 302 Kan. 560, 573-74, 357 P.3d 251 (2015).

The Kansas Criminal Code defines "[d]welling" as "a building *or portion thereof*, a tent, a vehicle or other enclosed space which is used or intended for use as a human habitation, home or residence." (Emphasis added.) K.S.A. 2017 Supp. 21-5111(k).

9

"Property" is defined as "anything of value, tangible or intangible, real or personal." K.S.A. 2017 Supp. 21-5111(w).

As noted, the applicable subsection of the arson statute requires the damaging of "any building or property" which "[i]s a *dwelling* in which another person has any interest without the consent" of another person. (Emphasis added.) K.S.A. 2017 Supp. 21-5812(a)(1)(A). Using the definitions provided in K.S.A. 2017 Supp. 21-5111 an apartment unit within a larger building must be considered a "[d]welling" under the arson statute because an apartment is "a building or portion thereof," or at a minimum, an apartment is an "enclosed space which is used or intended for use as a human habitation, home or residence." K.S.A. 2017 Supp. 21-5111(k).

To meet the applicable definition of arson here, the fire must have also damaged a dwelling "in which another person has any interest without the consent of such other person." K.S.A. 2017 Supp. 21-5812(a)(1)(A). An apartment tenant holds an interest in their leased property to the exclusion of others. K.S.A. 58-2543(o). Consequently, an apartment is a dwelling under the Kansas Criminal Code's definitions. As noted, the definition of property includes real property. And the code defines "'[r]eal property'" as "every estate, interest, and right in lands, tenements and hereditaments." K.S.A. 2017 Supp. 21-5111(bb).

Thus, the plain language of the arson statute, when considered with definitions outlined in the Kansas Criminal Code, shows that the Legislature intended for the definition of arson to encompass an apartment within a larger building. And, the plain language of the aggravated arson statute in question—K.S.A. 2017 Supp. 21-5812(b)(1)—is simple. Aggravated arson is arson committed upon a building or property in which there is a human being. If the plain language of the statute solely used the term "building," then Buchanan's interpretation would hold more weight. But the plain

10

language also employs the term "property," which as explained above, includes an apartment located within a larger building complex.

Consider the same situation—a single fire damaging multiple occupied residences—outside the context of an apartment building. If the unitary conduct of igniting a single fire was committed upon one occupied home and the same fire spread to another occupied home, the distinction is more obvious, yet the result is the same under the statute. While the conduct was still unitary, arson was committed upon a "building or property in which there is a human being" with the first home, together with the second home that was also "a building or property in which there is a human being." K.S.A. 2017 Supp. 21-5812(b)(1).

Although this court has not previously addressed multiplicity in the context of the Kansas arson statutes, it has addressed multiplicity in multiple other criminal statutes, including aggravated robbery. In the appellate court's interpretation of the aggravated robbery statute, K.S.A. 2020 Supp. 21-5420, the multiplicity analysis hinged on the presence of *victims* at the time of the robbery. See *State v. Dale*, 312 Kan. 174, Syl. ¶ 2, 474 P.3d 291 (2020) (holding that despite the defendants' aggravated robbery convictions arising from one transaction that constituted unitary conduct, the convictions were not multiplicitous because the unitary conduct involved two victims, each of whom had a claim to the control and possession of their property that the defendant stole from them at gunpoint). But here, whether multiple convictions for aggravated arsons are multiplicitous turns on the arson being committed upon *a property* in which there is a human being. Unlike the aggravated robbery statute (delineated a "person crime" by the Legislature [K.S.A. 2021 Supp. 21-5420(c)(2)]), the number of persons present at the time of the arson (a crime against property) does not necessarily control the unit of prosecution and is not our focus under these facts. If this were the unit of prosecution, the State could have charged Buchanan with a count of aggravated arson for each person that was present when the arson was committed.

11

Instead, the unit of prosecution should be determined by the "nature of the conduct proscribed," which includes arson being committed upon a single property in which there was a human being. *Schoonover*, 281 Kan. at 472. The aggravated arson charge regarding the apartment in which Maraya, her mother and K.J. lived was in the alternative to the attempted murder charges, so the jury convicted on the attempted murder of the three occupants rather than the arson on that apartment. But six other apartment units in the building in which Maraya lived—each its own dwelling—were occupied at the time of Buchanan's alleged arson, so Buchanan's six convictions for aggravated arson were not multiplicitous.

## THE STATE PRESENTED SUFFICIENT EVIDENCE TO SUPPORT BUCHANAN'S CONVICTIONS FOR ATTEMPTED FIRST-DEGREE MURDER

Next, Buchanan contends the State presented insufficient evidence of his intent to kill Maraya, her mother, and K.J. He does not challenge the State's evidence as insufficient to support any of the remaining elements of the crime.

When the sufficiency of the evidence is challenged in a criminal case, appellate courts "'review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). "This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

For the evidence below to have been sufficient, "there must be evidence supporting each element of a crime." *State v. Kettler*, 299 Kan. 448, 471, 325 P.3d 1075 (2014). Buchanan argues there was insufficient evidence to prove the intent element of the attempted first-degree murder convictions.

A jury convicted Buchanan of three counts of attempted first-degree murder under K.S.A. 2017 Supp. 21-5402(a)(1) and K.S.A. 2017 Supp. 21-5301(a). Under K.S.A. 2017 Supp. 21-5402(a)(1), first-degree murder is defined as "the killing of a human being committed: . . . [i]ntentionally, and with premeditation." And under K.S.A. 2017 Supp. 21-5301(a): "An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime."

To prove attempted first-degree murder, the State had to show Buchanan (1) attempted to commit an intentional, premeditated murder of a human being; (2) took an overt act toward perpetrating that murder; and (3) failed to complete the crime. *State v. Wilson*, 30 Kan. App. 2d 498, 499-500, 43 P.3d 851 (2002). Buchanan claims there was insufficient evidence to convict him of this offense, arguing neither direct proof nor circumstantial evidence of his intent to kill exists to sustain this element of his convictions.

Buchanan contends the State did not prove he intended to kill any of the three victims because if he had set the fire, "he would have had no way of knowing that anyone was home at the time." To support his argument, Buchanan argues Mother had "moved her car before the fire so as to appear not home" and as such, "[h]e could not have had the intent to kill the occupants by setting fire to an empty apartment." This is Buchanan's sole argument challenging the sufficiency of the State's evidence.

But appellate courts do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *Aguirre*, 313 Kan. at 209. This rule is particularly relevant to Buchanan's claim because an attempt crime requires specific intent to commit the attempted crime. See *State v. Robinson*, 256 Kan. 133, 137, 883 P.2d 764 (1994). And "[s]pecific intent is a question of fact for the jury which may be established by acts,

circumstances, and inferences and need not be shown by direct proof." *State v. Mitchell*, 262 Kan. 434, 437, 939 P.2d 879 (1997).

In this vein, Buchanan's attempt to argue the evidence was insufficient to prove intent is the precise argument he made to the district court. During his testimony, Buchanan stated he was unaware Mother had moved her car to avoid him the night of the fire, until he heard the testimony at trial. During closing arguments, Buchanan's defense counsel argued that because Mother moved her car, it "would suggest that even if Mr. Buchanan had come by, he would have assumed they weren't even home." His defense counsel added, "She intentionally hid the car so that it would appear that no one would be home and there is no reason that the State has shown that Mr. Buchanan would have even known they were at home."

Despite Buchanan's attempt to point out conflicting evidence, the jury was not persuaded. And while the absence of Mother's car from the apartment's parking lot may be one piece of evidence that could weigh in Buchanan's favor, his argument ignores this court's rule against reweighing evidence, resolving conflicts in the evidence, or passing on the credibility of witnesses. *Aguirre*, 313 Kan. at 209. Buchanan's argument also ignores the evidence, when viewed in the light most favorable to the State, that supports the finding that a rational fact-finder could have found Buchanan guilty beyond a reasonable doubt. See *Aguirre*, 313 Kan. at 209.

Jurors heard testimony from many witnesses during Buchanan's three-day trial and the State presented circumstantial evidence to establish Buchanan intentionally set the fire with the intent to kill his daughter and her two family members. To support the convictions, the State presented evidence that Buchanan intentionally set the fire in the stairwell landing directly in front of the apartment door. This stairwell was the only means of exit for Maraya and her family, and Buchanan was aware this was the only exit because he once lived in the apartment with the family.

14

The State also presented evidence that the fire was set around 4 a.m., when families and individuals within the apartment complex were asleep. To that end, the State presented testimony from at least one individual who lived in each apartment unit that had occupants. They all testified their families were asleep when the fire started around 4 a.m. Additionally, each member of Maraya's family was asleep when they awoke to discover fire engulfing their only means of escape.

Additionally, the State presented Buchanan's Facebook posts to argue he had intended to set the fire and kill his daughter, her mother, and younger brother because he was angry and showed a lack of remorse. At 11 p.m. the night before the fire, Buchanan posted he felt hurt and disrespected by Maraya and her mother at the graduation ceremony. A couple of hours after the fire was set Buchanan posted about the fire and stated he had "compassion" for the family, but the family had no support from him and it would "be a lie if I said I cared." Buchanan's text message to his daughter's friend, Snype, similarly stated he did not care about the losses Maraya and her mother had suffered because of the fire.

When viewing this evidence in the light most favorable to the State, a rational fact-finder could have found Buchanan guilty beyond a reasonable doubt. *Aguirre*, 313 Kan. at 209. While the evidence may be circumstantial, a verdict may be supported by circumstantial evidence if such evidence provides a basis for a reasonable inference by the fact-finder about the fact in issue. And to be sufficient, circumstantial evidence need not exclude every other reasonable conclusion. *State v. Colson*, 312 Kan. 739, 750, 480 P.3d 167 (2021). As a result, we find the State presented sufficient evidence to prove intent and affirm Buchanan's attempted first-degree murder convictions.

15

In his third issue on appeal, Buchanan argues the district court violated his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights because it did not appoint conflict-free counsel to litigate his pro se motion for a new trial. The State argues that although the district court dismissed Buchanan's motion without inquiry, the court did not err because it had dispensed of Buchanan's complaints against his trial counsel after sufficient inquiry before trial.

As the State extensively details, Buchanan repeatedly lodged complaints against his court-appointed counsel while filing many pro se motions. Within a few weeks of being appointed his first counsel, Buchanan requested that the attorney be removed. The district court addressed the motion during a hearing and informed Buchanan that his counsel may make strategic decisions that he does not agree with. Ultimately, however, the district court found the relationship was sufficiently strained and appointed another attorney.

The district court appointed Buchanan a second attorney, but he continued to file numerous pro se motions. A couple of weeks after the majority of Buchanan's pro se motions were filed, Buchanan's second appointed attorney requested to withdraw as counsel after Buchanan apparently lodged a disciplinary complaint against him. It seems the disciplinary complaint was summarily denied, but in any event, during a hearing on the motion, the district court allowed the second appointed counsel to withdraw and appointed a third court-appointed attorney.

At a pretrial conference held less than a week before his trial, while appearing with his third court-appointed attorney, Buchanan immediately interjected and stated he

was not ready for trial. Buchanan claimed his defense counsel did not secure a fire expert or a phone technology expert, and counsel did not complete the DNA analysis that Buchanan requested. The district court inquired into Buchanan's complaints and defense counsel explained those decisions were strategic. Buchanan's defense counsel stated that "through conversations [he] had [with a fire reconstruction expert], . . . with the building not currently there, they can do very little or nothing related to testifying on how the fire started or it did not start." Defense counsel explained:

> "I did look into getting a fire expert. I spoke to someone who does that. They said they would need to see the building or the reports of any chemicals that were found. They did not find any chemicals on here. I believe the State's theory is that acetone completely burns and doesn't have it. So that—but they can't look at a scene that doesn't exist and determine it was or was not an arson."

As for Buchanan's request to pursue a DNA expert, defense counsel explained that two DNA examinations confirmed the presence of Buchanan's DNA on the lemonade bottle found at the scene. Buchanan did not deny his DNA was on the bottle, but he told his defense counsel that he did not trust the people who conducted the DNA examinations. Defense counsel explained, "[Buchanan] gave me an explanation on why his DNA would have been on there so he's not arguing that it is incorrect that he didn't touch it. He's just saying he just doesn't trust those people. . . so I told him we weren't getting an expert on that." Buchanan stated he wanted a DNA expert to make a chain of custody argument. In response, defense counsel stated that he told Buchanan he planned to make this argument without another DNA analysis.

Defense counsel also addressed Buchanan's request for a cell phone technology expert and stated he did not need such expert under the circumstances. Defense counsel said, "[T]here is no issue there related to what the phone is or isn't. I have the phone records. I know how to look at the phone records on what they determined . . . there." Defense counsel advised the district court that he could "attempt to get someone that

17

might dispute what I understand about phones, and, I agree, I'm not an expert related to cell phones and what [Buchanan] believes could happen to explain this cell phone—why his cell phone was pinging off this tower when he was not there." But he could not have an expert prepared by the start of trial the following week.

The district court told Buchanan that if he wanted a continuance to obtain a phone expert, he should expect a long continuance. Buchanan responded by stating he "might as well get new counsel also" because he was "just not confident in proceeding to trial with [defense counsel]." To this, the district judge stated that he did not think any attorney would satisfy Buchanan's requirements because Buchanan was not listening to his attorney, and said, "It sounds to me like [defense counsel] has run down all of these issues that you have raised, but he's not giving you the answer that you want to hear."

After informing Buchanan that it may be a year before another appointed attorney could be prepared for trial, Buchanan and his defense counsel spoke privately. After a recess, Buchanan and his counsel returned and stated they were ready to proceed to trial as scheduled the following week. Defense counsel stated that he explained his decisions not to secure a fire or cell phone expert to Buchanan and Buchanan understood "those experts would not help or hurt us in any way and change anything." The district court inquired into whether they discussed Buchanan's request for a new counsel and Buchanan "apologize[d] to the Court and [his] counsel", stating he was "a little frustrated and . . . kind of reacted over that." The district court concluded the inquiry by stating it "just want[ed] to make sure we get these issues out here on the table and we resolve them all."

The district court held a jury trial the next week, and on January 15, 2020, the jury convicted Buchanan on all counts. He filed a pro se motion for new trial nearly two months later, on March 10, 2020. Under the statement of facts section, Buchanan lodged many allegations against his defense counsel. Along with the same complaints about securing experts, Buchannan alleged his defense counsel failed to list alibi witnesses and

failed to obtain a private investigator at the State's expense to track alibi witnesses. He also alleged his defense counsel "withheld scientific production regarding fire [debris] results" and refused "to file or argue any motions on the behalf of the defense, forcing [him] to file motions pro-se."

Buchanan also stated he "contacted the honorable judge by mail with [an] articulated statement of attorney dissatisfaction outlining reasons" and confirmed he stated his dissatisfaction with his attorney at the pretrial hearing where he asked the district court "to remove counsel and to reschedule [the] trial date." Buchanan added: "This should of [*sic*] trigger[ed] the district judge to inquire into potential conflict of interest, complete breakdown of communication between counsel and defendant."

Defense counsel also filed a motion for new trial one day after the pro se motion, stating only that Buchanan was moving for a new trial "pursuant to K.S.A. 22-3501 . . . ." The district judge addressed the motions for new trial at the sentencing hearing the next day, and refused to hear Buchanan's pro se motion:

> "All right. Now, . . . I just want to take up some things because Mr. Buchanan has filed his own pleadings in this case, and I think we've talked about this, Mr. Buchanan. You can represent yourself. You can have counsel represent you but you can't have both. You can't have what is called a hybrid representation. So I've read your motions, and some of it is included in what [defense counsel] has filed on your behalf, but because you're represented by counsel, I'm not going to hear your motions that you filed that we would call pro se or you filed on your own."

The district court then denied the motion filed by Buchanan's counsel, stating, "[T]he issues raised in the motion for new trial do not constitute a reason for the Court as a matter of law to grant a new trial."

19

*Preservation*

Buchanan concedes that he is raising this argument for the first time on appeal. As a general rule, constitutional violations cannot be newly raised on appeal. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). That said, appellate courts may consider newly raised constitutional issues if the party making the claim shows the issue meets one of the following recognized exceptions:

> """[T]he newly asserted claim involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) the claim's consideration is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court's judgment may be upheld on appeal despite its reliance on the wrong ground or reason for its decision.""" *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021) (quoting *State v. Harris*, 311 Kan. 371, 375, 461 P.3d 48 (2020)]).

The right to counsel is a fundamental right. *State v. Loggins*, 40 Kan. App. 2d 585, 595, 194 P.3d 31 (2008). Moreover, deciding the merits of Buchanan's claim does not require this court to make factual findings. As a result, in our discretion we review Buchanan's Sixth Amendment claim although he makes it for the first time on appeal.

*Buchanan's motions for new trial were untimely and the district court did not abuse its discretion in summarily denying relief.*

When a criminal defendant files a timely pro se posttrial motion for new trial, this becomes a critical stage of the proceedings during which the defendant is entitled to the representation of counsel, which includes the correlative right of conflict-free counsel. *State v. Sharkey*, 299 Kan. 87, 95-96, 322 P.3d 325 (2014) (citing *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 [1981]). A district court has a duty to determine whether the pro se motion raises a potential conflict of interest between the defendant and counsel. If a potential conflict is apparent, the court has a duty to make a full inquiry into the allegations to determine whether they warrant the appointment of a

new attorney. If the district court fails to make an adequate inquiry into the potential conflict, prejudice will be presumed. *Sharkey*, 299 Kan. at 96-101.

Buchanan relies on *Sharkey* to argue the district court constructively denied his right to counsel by failing to appoint conflict-free counsel to litigate the ineffective assistance of counsel claim lodged in his pro se motion for new trial. But the defendant in *Sharkey* timely filed his motions. Buchanan did not—he filed his motion nearly two months later. See K.S.A. 2021 Supp. 22-3501 (requiring a motion for new trial not based on newly discovered evidence to be made within 14 days after the verdict).

Our Supreme Court distinguishes timely and untimely motions for a new trial. See *Sharkey*, 299 Kan. at 94-95; *State v. Kingsley*, 252 Kan. 761, 766-67, 851 P.2d 370 (1993). A timely motion for a new trial is considered a critical stage of the criminal proceeding, while an untimely one is not. Because an untimely pre-appeal motion for a new trial is considered a collateral proceeding, the Sixth Amendment right to counsel does not apply, and the right to counsel is determined instead by statute. See *Sharkey*, 299 Kan. at 95-96 (citing *Kingsley*, 252 Kan. at 766-67).

The district court had to consider Buchanan's untimely pro se motion as a postconviction, collateral proceeding and apply K.S.A. 22-4506, governing entitlement to counsel of persons in custody after felony convictions, to determine whether he was entitled to appointment of substitute counsel. The *Sharkey* court explained district courts may summarily deny untimely, postconviction collateral attacks without appointing counsel. "In such a case, a trial judge 'may determine that the motion, files, and records of the case conclusively show that the movant is entitled to no relief, in which case [the judge may] summarily deny the motion without appointing counsel.'" 299 Kan. at 95 (quoting *Albright v. State*, 292 Kan. 193, 196, 251 P.3d 52 [2011]). It is within the sound discretion of the trial court to determine whether the motion presents "substantial questions of law justifying the appointment of counsel." *Sharkey*, 299 Kan. at 95.

21

"'Judicial discretion is abused if the judicial action is (1) arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would take the view adopted by the trial court; (2) based on an error of law, *i.e.*, the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. . . . The defendant bears the burden of showing the court abused its discretion.' [Citation omitted.]" *State v. McDaniel*, 306 Kan. 595, 606, 395 P.3d 429 (2017).

Buchanan's argument on appeal seems to assume his constitutional right to conflict-free counsel was extended to his pro se motion for new trial. Buchanan does not acknowledge his motion was untimely or consider whether the district court abused its discretion under K.S.A. 22-4506. Instead, he narrowly focuses on whether the district court erred by failing to appoint counsel to argue his pro se motion for a new trial because the district court did not inquire into his complaints lodged against his trial counsel. But this argument ignores the procedural posture of this issue—the summary denial of Buchanan's untimely motion.

A review of the district court's decision leads us to conclude the district court did not abuse its discretion in summarily denying either motion, so it did not abuse its discretion when it did not appoint conflict-free counsel to represent Buchanan in his complaints against his trial counsel. Our Supreme Court has reviewed a comparable situation in *Kingsley*. 252 Kan. at 765-67.

In *Kingsley*, although defense counsel timely moved for a new trial, Kingsley filed an untimely pro se motion mostly alleging grievances against trial counsel. The district court heard an argument from defense counsel on his motion for new trial, but the defendant represented himself on his pro se motion that alleged complaints against his still-appointed trial counsel. On appeal, the defendant contended it was his "trial counsel's

duty to request permission to withdraw because his success on the motion would have been her downfall." 252 Kan. at 765-66.

Ultimately, the *Kingsley* court agreed with the State's argument that Kingsley was not entitled to the appointment of counsel on his untimely pro se motion that alleged complaints against his trial counsel "because there were no 'substantial issues' raised." 252 Kan. at 766. The court reasoned Kingsley "did not have an absolute right to appointment of counsel other than trial counsel to represent him on his pro se motion," in part because his motion was untimely and did not contain a "'realistic basis'" for a new trial. 252 Kan. at 767.

"[K.S.A. 22-4506] provides in pertinent part:  '(b) If the court finds that the petition or motion presents substantial questions of law . . . the court shall appoint counsel . . . to assist such person.'" *Kingsley*, 252 Kan. at 766. If it appears the motion may have some merit, "'then the trial court in the exercise of its discretion should set the matter for hearing and appoint counsel to represent the defendant.'" 252 Kan. at 767. See *State v. Buckland*, 245 Kan. 132, 142, 777 P.2d 745 (1989).

Here, the district court neither acknowledged the motions were untimely, nor stated it was summarily denying Buchanan's pro se motion without appointing substitute counsel under K.S.A. 22-4506. Even so, it did deny the motions because "the issues raised in the motion for new trial do not constitute a reason for the Court as a matter of law to grant a new trial." Summary denial of the untimely posttrial motions for new trial was proper because Buchanan did not present a substantial question of law that justified the appointment of substitute counsel to argue his pro se motion. See *Sharkey*, 299 Kan. at 95.

During the pretrial conference, the district court addressed and resolved most of the complaints against trial counsel that Buchanan lodged in his pro se motion. To this

23

extent, the district court met its burden of inquiring into the alleged conflict between Buchanan and his trial counsel. See *Sharkey*, 299 Kan. at 96 (holding that trial court has a duty to make full inquiry into potential conflict allegations to determine whether they warrant appointment of a new counsel). And, although Buchanan's pro se motion included new complaints against his trial counsel, which he labeled as facts, he provided no evidentiary support for the conclusory claims. Likewise, no support is evident from the record.

Buchanan's remaining claims in his pro se motion about prosecutorial misconduct and jury instructions similarly did not present a substantial question of law that warranted a new trial or justified the appointment of substitute counsel. Much of Buchanan's pro se motion presents conclusory claims without supporting authority and which rely on factual allegations made without support from the record.

For example, Buchanan claims the prosecutor "withheld witness from defense until the first day of trial" which violated his due process rights under the Fourteenth Amendment. But Buchanan did not specify which witness was allegedly withheld until the first day of trial. He simply states it happened and alleges he was denied his due process rights. Buchanan's remaining prosecutorial misconduct claims were similarly unsupported by the record or the law.

Buchanan also claimed jury instruction errors in his pro se motion. He argued that he requested "pattern instruction from the honorable judge in letter and attorney, [but he] hasn't received the instruction." He claimed the pattern instruction did not properly instruct the jury on the definition of "'overt act'" for attempt crimes and requested a reversal because the "jury may have been misled into believing that mere preparations constitutes [*sic*] an overt act." Buchanan relies on *State v. Calvin*, 279 Kan. 193, 105 P.3d 710 (2005), to make his argument, but he mischaracterizes the holding. The *Calvin* court held: "While the better practice would have been to include the definition of 'overt act' as

24

provided in the pattern instruction, this error was harmless as the instruction properly and fairly stated the law as applied to the facts of this case." 279 Kan. at 204. The same is true for Buchanan's jury instruction, which stated: "An overt act necessarily must extend beyond mere preparations made by the accused . . . ." Buchanan's claim that the instruction may have misled the jury into believing that mere preparations constitute an overt act is not supported by the actual jury instruction given that says it "necessarily must extend beyond mere preparations made."

In sum, Buchanan's claim was denied because his pro se motions did not present a claim that shows he would have a right to relief, and the district court did not abuse its discretion in determining that the motions did not present substantial questions of law justifying the appointment of conflict-free counsel under *Sharkey*. 299 Kan. at 95.

BUCHANAN'S PRO SE SUPPLEMENTAL ISSUES

*The State presented sufficient evidence to support Buchanan's convictions.*

Buchanan filed a pro se supplemental appellate brief raising multiple issues on top of those raised by his counsel. In his first supplemental issue, Buchanan makes several challenges to the sufficiency of the State's evidence. First, he repeats an issue addressed by his counsel, contending the State presented insufficient evidence to show Buchanan intended to kill his daughter, her brother, and their mother. As discussed above, a rational fact-finder could have found Buchanan guilty beyond a reasonable doubt based on the evidence presented at trial. *Aguirre*, 313 Kan. at 209.

Second, Buchanan argues the district court erred by admitting the testimony of the State's fire investigator, Bob Eddy. Buchanan claims Eddy failed to follow the Guidelines of the National Fire Protection Association. As a result, he contends the evidence was "scientifically unreliable and inadmissible absent confirmation through lab testing."

Buchanan also briefly argues the trial court erred in admitting the opinion testimony of the State's KBI forensic scientist, Somiyeh Zalekian.

Buchanan's claims challenging the admissibility of evidence are not sufficiency of the evidence challenges, despite his framing of the issue. And, as the State argues, Buchanan did not preserve these claims for appellate review because he did not make a specific and timely objection to the admission of this evidence at trial.

"'The contemporaneous objection rule requires each party to make a specific and timely objection at trial in order to preserve evidentiary issues for appeal. K.S.A. 60-404. The purpose of the rule is to avoid the use of tainted evidence and thereby avoid possible reversal and a new trial.'" *State v. Brown*, 307 Kan. 641, 645, 413 P.3d 783 (2018) (quoting *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 [2010]). And our Supreme Court has refused to apply the three recognized exceptions for appellate review of issues not raised below to absolve a party of K.S.A. 60-404 violations. *Brown*, 307 Kan. at 645. See *Dukes*, 290 Kan. at 488 (identifying the exceptions and "expressing concern that the contemporaneous objection rule 'case law exceptions would soon swallow the general statutory rule'"). As a result, Buchanan's issue challenging the admission of the State's evidence is not preserved for appellate review.

*Prosecutorial error or misconduct claims were not preserved.*

In his second issue on appeal, Buchanan makes several challenges that he frames as prosecutorial error or misconduct. As a threshold issue, we decline to consider his argument that the State "used expert witnesses to misrepresent material facts to the court and the jury to convict [him]" because Buchanan did not preserve this admissibility challenge under the contemporaneous objection rule. See K.S.A. 60-404; *Brown*, 307 Kan. at 645.

Similarly, Buchanan also did not preserve his claim that the State removed confidential trial strategy notes from him while he was on the stand. Appellate courts will review claims of prosecutorial error based on comments made during voir dire, opening statement, or closing argument without a timely objection. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021). But Buchanan must have lodged a contemporaneous objection to all evidentiary claims to preserve the issue of prosecutorial error on appellate review. *State v. Lowery*, 308 Kan. 1183, 1195-96, 427 P.3d 865 (2018). This alleged error occurred while Buchanan was testifying and an objection was required to preserve this issue for appellate review. Buchanan made no such objection.

But even if he had made the objection, Buchanan does not designate a record to support his claim. As the party claiming an error occurred, Buchanan has the burden of designating a record that affirmatively shows prejudicial error. Without such a record, an appellate court presumes the district court's action was proper. *Meggerson*, 312 Kan. at 249. And the record shows that while the State did seek to confirm the document Buchanan was holding during his testimony was an admitted exhibit, none of the actions were error. Once the State confirmed the identity of the document, the document was returned to Buchanan and questioning continued. This was also not a legal error because Kansas courts have "long recognized the principle that generally the opposing party or his counsel has the right to inspect papers used by a witness for the purpose of refreshing his memory upon matters as to which he is testifying." *State v. Mans*, 213 Kan. 36, 39, 515 P.2d 810 (1973).

*Buchanan shows no error in defining reasonable doubt for the jury.*

Buchanan appears to have preserved his remaining pro se arguments. He begins by arguing the State and the district court erred by failing to provide a "more defined definition of [r]easonable doubt" upon the jury's question seeking a definition of reasonable doubt. But as the State argues, the district court and both parties agreed that

defining reasonable doubt was improper. This conclusion is supported by Kansas case law, which has "long held that 'a jury instruction defining reasonable doubt is unnecessary . . . .'" *State v. Garcia-Garcia*, 309 Kan. 801, 816, 441 P.3d 52 (2019) (quoting *State v. Banks*, 260 Kan. 918, 927, 927 P.2d 456 [1996]). In *State v. Wilson*, 281 Kan. 277, 287, 130 P.3d 48 (2006), our Supreme Court reiterated the courts holding that "'"no definition or explanation can make any clearer what is meant by the phrase 'reasonable doubt' than that which is imparted by the words themselves.'" [Citations omitted.]" As such, Buchanan has not shown the district court or the State committed an error in refusing to further define reasonable doubt upon the jury's request.

*Buchanan did not show the State withheld DNA evidence.*

Next, Buchanan claims the prosecutor "withheld necessary and required exculpatory D.N.A. evidence" when the State offered the glass lemonade bottle into evidence. Buchanan claims the bottle revealed three DNA profiles, but Buchanan's DNA "was the only D.N.A. the State chose to single out." He also alleges the State chose to leave the remaining DNA profiles unidentified, claiming this was "selective prosecution."

The State presented evidence that the DNA recovered the from the mouth of the lemonade bottle was a mixture of three individuals. Bethany Stone, a forensic scientist with the DNA section of the Johnson County Crime Lab, testified the mixture contained the presence of male DNA. She testified, "And assuming that there are three contributors to this mixture, it was 88.1 trillion times more likely to see that DNA mixture if Ronald Buchanan and two unknown individuals are the contributors than if three unknown individuals are the contributors." Stone put it more simply, "The evidence is it's strong support for Ronald Buchanan being one of the contributors to the mixture."

On cross-examination, Buchanan's defense counsel questioned Stone on the presence of the two remaining DNA profiles. Stone conceded that "there are a number of

28

things that can leave DNA," and stated there was a potential that "three people had either touched [the bottle] or drank out of it." Stone also conceded that she could not say how long the DNA had been on the lemonade bottle.

The State also presented evidence of a DNA profile taken from a swab from a different portion of the bottle. Stone testified this DNA profile was "a partial single source profile from a male," which signifies the DNA came from "one person, so one source." Based on the analysis of this swab, which also revealed the source was male, "it was 394 million times more likely to see that partial DNA profile if Mr. Buchanan was the source than if an unknown individual would be the source." In layman's terms, Stone testified "it's strong support for Ronald Buchanan being the source of that DNA."

Buchanan claims the State left the remaining DNA profiles "unidentified" and withheld the identities. It is unclear how the State could withhold the identity of what were explained to be unidentified DNA profiles. But in any event, Buchanan does not support his allegations of withholding the unidentified DNA profiles with a citation to the record. Without such a record, an appellate court presumes the district court's action was proper. *Meggerson*, 312 Kan. at 249.

As a result, Buchanan has not shown the State withheld evidence which affirmatively shows prejudicial error. The record shows the jury was aware of the presence of the two remaining DNA profiles and still found Buchanan guilty. And Buchanan has not met his burden of designating a record to support his claim of withheld evidence.

*The prosecutor did not commit prosecutorial misconduct.*

Buchanan argues the prosecutor committed prosecutorial misconduct in various arguments she made to the jury. The appellate court uses a two-step process to evaluate

29

claims of prosecutorial error: error and prejudice. To determine whether prosecutorial error occurred, appellate courts must first decide whether the prosecutorial acts complained of fall outside the wide latitude afforded to prosecutors. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). If error is found, appellate courts must determine whether the error prejudiced the defendant's due process rights to a fair trial under the traditional constitutional harmless inquiry demanded by *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d. 705 (1967). See *Sherman*, 305 Kan at 109.

> "In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" 305 Kan. at 109.

See *State v. Fraire*, 312 Kan. 786, 791-92, 481 P.3d 129 (2021).

Buchanan claims the prosecutor made multiple statements that fall outside the wide latitude afforded to prosecutors because the "emotionally charged and inflammatory comments . . . [inflamed] the passions of the jurors . . . ." He complains of multiple statements, all of which the prosecutor made during closing arguments.

Because the disputed statements occurred during closing arguments, this court can consider review of the claims without a timely objection to preserve the issue for appeal. Even so, this court may figure the presence or absence of an objection into its analysis of the alleged error. *Bodine*, 313 Kan. at 406.

Buchanan challenges the prosecutor's final statement at closing, where the prosecutor stated:

30

"This was not an act of God. This was the act of one man and I ask you to find him guilty on all the counts because it wasn't God that is responsible for the events that night. It's that man. It's Ronald Buchanan and you should find him guilty as he's charged."

Buchanan also challenges the prosecutor's statements during closing that suggested he lacked remorse and made hate filled comments to "women that he claims to care about."

"'[I]t is the duty of the prosecutor in a criminal matter to see that the State's case is properly presented with earnestness and vigor and to use every legitimate means to bring about a just conviction, . . .'" and prosecutors are given wide latitude in arguing the cases before them. *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009) (quoting *State v. Ruff*, 252 Kan. 625, 634, 847 P.2d 1258 [1993]). "'Inherent in this wide latitude is the freedom to craft an argument that includes reasonable inferences based on the evidence.'" *King*, 288 Kan. at 351.

Here, the prosecutor's statements fall under the prosecutor's wide latitude to craft an argument that includes reasonable inferences based on the evidence. As the State argues, the prosecutor's "was not an act of God" comment responded to Buchanan's testimony and Facebook post in which Buchanan stated Maraya and her family "Got What God sent to em." Before concluding that the fire "was not an act of God," the prosecutor extensively detailed the evidence presented at trial. Referencing the Facebook post where Buchanan stated his daughter and her family "Got What God sent to em," the prosecutor stated Buchanan "describes karma and God as the reasons for this fire . . . ." This statement is a reasonable inference based on the evidence.

Buchanan's Facebook post, along with other evidence, also supports the State's argument that it properly stated Buchanan lacked remorse when it discussed the words he used. The State made reasonable inferences from the evidence that Buchanan lacked

31

remorse. Along with the Facebook post above, for example, Maraya's friend, Snype, testified Buchanan sent her a private message on Facebook soon after the fire. Part of the message was read into the record and a screenshot of the following message was admitted into evidence at trial:

> "Maraya and [Mother] tryna [*sic*] to say I did it . . . which I didn't, and after the way she treated me I don't care what them Bitches lossed [*sic*] over there especially [Mother] maybe it was one of her escort clients she keeps . . . I'm doing very well myself I have 2extra fully furnished rooms upstairs,, [*sic*] AND THEM BITCHES STILL AINT WELCOME ILL [*sic*] USE THE ROOM AS A PISS PAD B4 [*sic*] I MOVE HER AND HER TRASHY CHEAP WHORE OF A MOTHER . . . AHHHHHHHH HAHAHAHAAA LOW BUDGET OVERMILEAGE BOTCHED 50 YEAR OLD FACE [MOTHER] BETTER LEAVE ME ALONE PRAY FOR LOPSIDED FACE AND THAT FAL [*sic*] INFECTED VAGINA THAT RUNS EVERY MAN AWAY . . . ."

The State charged Buchanan with three counts of attempted first-degree murder, which requires premeditation. Evidence of lack of remorse by the defendant is admissible to support an inference of premeditation. See *State v. Carter*, 305 Kan. 139, 153, 380 P.3d 189 (2016) (holding that the defendant's behavior and statements "that show lack of remorse . . . could be considered by the jury for whatever weight they would bear"). So, the State did not make a comment outside the wide latitude afforded when it reasonably drew an inference about Buchanan's lack of remorse to support an inference of premeditation.

*The State did not introduce inadmissible evidence of an unknown car.*

In his final argument, Buchanan contends the State "introduced inadmissible evidence of [an] unknown car near [the] scene of [the] fire" which amounted to "a misstatement of facts from [the] State witness [Detective Charles] Wimsatt." This is not a prosecutorial misconduct claim, but an admissibility of evidence claim. But as Buchanan

32

notes, his defense counsel objected to the State's attempt to elicit testimony from Detective Wimsatt about what he believed was the make and model of the car seen on the traffic camera imagery. The district court sustained the objection, and the prosecutor changed her line of questioning.

The next day, Detective Wimsatt returned to the stand and testified he had viewed the video footage of the car driving near the apartment complex. The detective confirmed the car in the footage had characteristics "consistent with the Pontiac G6 that had been noted in this case," such as the car's body size, number of doors, and the distinct shape of the taillights. Defense counsel then cross-examined Detective Wimsatt and the detective conceded the Pontiac G6 car is similar to the Chevy Cobalt and the Saturn Ion. Detective Wimsatt also conceded the cars have the same basic length and style.

The State did not improperly introduce inadmissible evidence into the record. The jury heard testimony that the type of car seen in the video was similar to the Pontiac G6 that Buchanan owned, but it also heard testimony that the car appears much like other styles of similarly sized cars. This testimony from Detective Wimsatt was admissible and Buchanan has not shown otherwise.

Because the State presented sufficient evidence to support Buchanan's convictions, and he either failed to preserve his prosecutorial error claims or failed to show error in prosecutor statements or admission of evidence, Buchanan's supplemental pro se issues are unconvincing.

Affirmed.